**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHAWN S.,[1] | : | Case No. 2:25-cv-00014 |
| | : | |
| Plaintiff, | : | District Judge Algenon L Marbley |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

---

**REPORT AND RECOMMENDATION[2]**

---

Plaintiff's application for benefits is before this Court for the fourth time. Plaintiff

filed an application for Supplemental Security Income (SSI) on September 26, 2013.

Plaintiff's claim was denied initially and upon reconsideration. After two hearings at

Plaintiff's request, an Administrative Law Judge (ALJ) concluded that Plaintiff was not

eligible for benefits because he was not under a "disability" as defined in the Social

Security Act. The Appeals Council denied Plaintiff's request for review of that decision,

and Plaintiff filed his first action with this Court.[3] The Court remanded the case to the

Commissioner under Sentence Four of 42 U.S.C. § 405(g) after the parties jointly moved

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

[3] Assigned to District Judge George C. Smith, Case Number 2:17-cv-00626.

for a remand. The Appeals Council remanded the case pursuant to the District Court's order. The same ALJ held another hearing and again concluded that Plaintiff was not under a "disability" as defined in the Social Security Act. After the Appeals Council denied Plaintiff's request for review of that decision, Plaintiff filed his second action with this Court.[4] The Court again remanded the case to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) after the parties jointly moved for a remand. The Appeals Council remanded the case pursuant to the District Court's order.

A new ALJ held a hearing and issued a third unfavorable decision in this case, concluding that Plaintiff was not under a "disability" as defined in the Social Security Act. Plaintiff subsequently filed his third action with this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3).[5] After full briefing, the Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C. § 405(g), and the Appeals Council remanded pursuant to the District Court's order. The same ALJ held another hearing and concluded, again, that Plaintiff was not under a "disability" as defined in the Social Security Act. Plaintiff then filed the present case, which is his fourth action in this Court.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, it is recommended that the Court REVERSE the Commissioner's decision and REMAND for

---

[4] Assigned to District Judge Sarah D. Morrison, Case Number 2:20-cv-03936.

[5] Assigned to Chief District Judge Algenon L. Marbley, Case Number 2:22-cv-01958.

an immediate award of benefits for a closed period of disability from September 26, 2013 to December 31, 2014, and for further proceedings for the period since January 1, 2015.

## I.    BACKGROUND

Plaintiff asserts that he has been under a disability since July 15, 2005.[6] He was eighteen years old on the SSI application date of September 26, 2013. Accordingly, Plaintiff was considered a "younger person" under the Social Security regulations. *See* 20 C.F.R. § 416.963(c). Plaintiff has a "high school education and above." *See* 20 C.F.R. § 416.964(b)(4).

The evidence in the Administrative Record ("AR," Doc. No.  7) is summarized in the ALJ decision dated September 16, 2024 ("2024 Decision," Doc. No. 7-21 at PageID 999-1037), Plaintiff's Statement of Errors ("SE," Doc. No. 8), and the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 9). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II.    STANDARD OF REVIEW

The Social Security Administration provides SSI to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically

---

[6] Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. Thus, the relevant period of consideration in this case began on September 26, 2013. See 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x. 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is . . . the date [the claimant] filed his protective application.").

determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id.*

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v.*

4

*Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III. FACTS

### A. The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920. The ALJ made the following findings of fact:

| | |
|---|---|
| Step 1: | Plaintiff has not engaged in substantial gainful activity since September 26, 2013, the SSI application date. |
| Step 2: | He has the severe impairments of bipolar disorder, oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), radiculopathy, asthma, gastroesophageal reflux disease, and cannabis use disorder. |

5

| | |
|---|---|
| Step 3: | He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | His residual functional capacity (RFC), or the most he can do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 416.967(b), subject to the following limitations: "[H]e can have no more than four hours of standing and/or walking during the workday; occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, and crouching; no kneeling or crawling; no exposure to workplace hazards such as unprotected heights or dangerous, unprotected moving mechanical parts; occasional exposure to humidity and extreme heat and cold; and occasional exposure to concentrated irritants such as visible dust clouds, noxious odors, caustic fumes, and other such pulmonary irritants. Mentally, [Plaintiff] retain[s] the capacity to perform simple, routine, repetitive tasks, but not at a production rate pace such as one has with assembly line work; can have no more than occasional interactions with supervisors, coworkers, and the public; interactions with others would be superficial, meaning interactions would be limited to the straightforward exchange of information, without negotiation, persuasion, conflict resolution, close teamwork, tandem work, or over the shoulder supervision; no more than occasional, minor changes in duties, routine, and the work setting; and he can have no contact with or access to illegal drugs as part of the job duties, such as one might have in a law enforcement setting." |
| | He has no past relevant work. |
| Step 5: | Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. |

(2024 Decision, Doc. No. 7-21 at PageID 1005-25.) These findings led the ALJ to

conclude that Plaintiff does not meet the definition of disability and so is not entitled to

benefits. (*Id.* at PageID 1025-26.)

### B. Consultative Psychologist Dory Sisson, Ph.D.

Dory Sisson, Ph.D., performed a consultative psychological evaluation on behalf of the Disability Determination Services in February 2014. (AR, Doc. No. 7-7 at PageID 360-71.) In a narrative report, Dr. Sisson documented Plaintiff's reported subjective complaints and her mental status examination findings. (*Id.* at PageID 361-69.) Dr. Sisson concluded that her findings supported diagnoses of ADHD, mood disorder, and psychosis (by history). (*Id.* at PageID 369-70.)

When asked to assess Plaintiff's mental abilities and limitations in understanding, remembering, and completing directions, Dr. Sisson opined that Plaintiff "would be capable of understanding and following instructions to complete a basic work task." (AR, Doc. No. 7-7 at PageID 370.) She noted that although no specific testing was available for review, Plaintiff reported that he experienced learning disabilities in school. (*Id.*) Dr. Sisson therefore opined that Plaintiff's abilities in reading and writing "were likely to be impaired." (*Id.*) Dr. Sisson also opined: "His ability to remember instructions would be impaired based on ADHD and he would likely need instructions repeated." (*Id.*) In the area of maintaining attention, concentration, persistence, and pace to perform routine tasks, Dr. Sisson wrote:

> Based on observation and reported symptoms, he would be expected to have difficulties maintaining attention and concentration to complete a task for more than a limited period of time. He would be expected to need increased supervision to ensure follow through, an environment with minimal distractions, redirection to task, and opportunities for breaks. Pace of performance may be somewhat slow based on observations during the mental status examination.

(*Id.*)

As for relating to others, including coworkers and supervisors, Dr. Sisson wrote that Plaintiff "report[ed] getting along with others in the workplace in the past and was generally appropriate with the examiner today." (AR, Doc. No. 7-7 at PageID 370.) Dr. Sisson opined that Plaintiff "appears to be capable of interacting appropriately with coworkers and supervisors." (*Id.*) Yet Dr. Sisson noted that Plaintiff reported "irritability and mood swings," and so opined that Plaintiff "may demonstrate verbal outbursts with others at work when provoked." (*Id.*) Dr. Sisson also wrote: "He also reports experiencing anxiety 'when a lot of people are looking at me,' therefore he may not like working in large groups of people." (*Id.*) In the final area of responding appropriately to work pressures, Dr. Sisson wrote: "[Plaintiff] would be able to respond appropriately to low stress work situations. As more stressful work situations arise, he may demonstrate an increase in affective instability, including the potential for verbal outbursts and an increase in depressive symptoms." (*Id.* at PageID 371.)

As for fund management, Dr. Sisson stated that Plaintiff "may need assistance or supervision," based on his "difficulties completing math tasks on the mental status examination and his report of learning difficulties in school." (AR, Doc. No. 7-7 at PageID 371.) Dr. Sisson noted, however, that she did not have "specific testing" available to clarify Plaintiff's abilities in this area. (*Id.*)

The ALJ afforded little weight to Dr. Sisson's opinion. (2024 Decision, Doc. No. 7-21 at PageID 1023.) The ALJ acknowledged that Dr. Sisson "had the opportunity observe, interact with and objectively examine [Plaintiff]," but concluded that her opinions were "vague and offered in terms that are not vocationally appropriate terms."

8

(*Id.* at PageID 1022-23.) The ALJ also stated that "Dr. Lace testified that [Dr. Sisson's] opinions regarding [Plaintiff's] likely need to have instructions repeated, increased supervision, minimal distractions, and extra breaks were already accounted for in the mental residual functional capacity he articulated at the hearing." (*Id.* at PageID 1023.)

### C. Examining Psychologist Lee Roach, Ph.D.

Lee Roach, Ph.D. evaluated Plaintiff on behalf of the Bureau of Vocational Rehabilitation (BVR) in July 2014. (AR, Doc. No. 7-7 at PageID 374-87.) Dr. Roach documented Plaintiff's reported subjective complaints and his mental status examination findings in his narrative report. (*Id.* at PageID 374-77.) Dr. Roach also documented Plaintiff's scores on the Wechsler Adult Intelligence Scale – Fourth Edition and the Reading-Free Vocational Interest Inventory. (*Id.* at PageID 377-79, 386-87.)

In the "Vocational Projections" section of the report, Dr. Roach opined that Plaintiff "lacks the emotional maturity by being open to constructive criticism," that he "appears unable to work at a pace required in a competitive job situation," and that he was "unable to <u>consistently</u> do multiple tasks in part to his <u>ADHD disorder</u>." (AR, Doc. No. 7-7 at PageID 379 (emphasis in original).) According to Dr. Roach: "Difficulties in maintaining concentration, focusing his attention at times, and work pace/speed would be an initial concern for prospective job placements." (*Id.*) Dr. Roach opined that Plaintiff appeared to have "appropriate emotional coping skills and age[-]appropriate problem[-]solving skills" for potential employment." (*Id.* at PageID 380.) However Dr. Roach also opined that Plaintiff "[r]equires a highly supportive/structured work environment" and

9

that his "learning discrepancies in spelling and math may present an employment barrier for independent functioning." (*Id.* at PageID 379.)

In the "Discussion of the Four Work-Related Mental Abilities" section, Dr. Roach opined that Plaintiff was mildly impaired in the ability to understand, remember, and carry out one- or two-step job instructions. (AR, Doc. No. 7-7 at PageID 383.) Dr. Roach noted: "His thought processes are at times inadequate to carry out job[-]related efforts from his ADHD disorder and inability to consistently focus on job tasks. However, he has usually been able in his past school experiences to maintain the requisite pace but had difficulty maintaining attention to perform repetitive tasks." (*Id.*) In the area of interacting with others, Dr. Roach found mild impairment. (*Id.*) Dr. Roach noted that Plaintiff's ability to interact with supervisors and coworkers had been tested in a "very brief job situation." (*Id.*) Dr. Roach further explained: "It was indicated in the clinical interview that [Plaintiff] had difficulty comprehending verbal directions and prefers to be shown how to do the job as opposed to telling him. He appears to have the potential to develop appropriate relationships with authority figures/supervisors/parents." (*Id.*)

As for the ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks, Dr. Roach opined that Plaintiff was markedly impaired. (AR, Doc. No. 7-7 at PageID 384.) Dr. Roach wrote: "At the present time [Plaintiff] also appears to have major attention lapses to restrict work tasks. Job skills appear to have the potential to further develop skills to work at an age[-]appropriate work pace." (*Id.*) In the final area of responding to the stress and pressures of day-to-day work activity, Dr. Roach

noted that Plaintiff's abilities in this area "ha[d] not been tested," but he estimated that

Plaintiff experienced moderate impairment. (*Id.*) Dr. Roach stated:

> [Plaintiff] shows occasional mental limitations in dealing with personal
> problems resulting in sustained periods of anxiety and frustration. His
> success may be enhanced if he is given assistance/coaching and/or
> accommodations in terms of his ADHD deficit and limited concentration
> with emphasis on maintaining his focus on multiple job priorities. He
> denied any suicidal ideation.
>
> Further job development work is needed in situations where time pressure
> is prevalent or where the quality of work is judged critically by supervisors,
> customers[,] or others.

(*Id.*)

The ALJ gave "some weight" to Dr. Roach's opinion that Plaintiff has moderate

impairment in the ability to withstand the stress and pressures associated with day-to-day

work activity. (2024 Decision, Doc. No. 7-21 at PageID 1023.) The ALJ found this

opinion "consistent with the totality of the evidentiary record" and concluded that it

"supports the finding herein [Plaintiff] has a moderate limitation in adapting and

managing oneself." (*Id.*) However, the ALJ discounted Dr. Roach's opinion regarding

Plaintiff's limitations in the areas of concentration, persistence, and pace, applying

information, and interacting with others because the opinion was from 2014:

> Dr. Roach examined [Plaintiff] approximately ten years ago. The objective
> medical evidence at the administrative hearing level, including more recent
> psychological evaluations and Dr. Lace's testimony at the hearing, simply
> do not support a marked limitation in his ability to concentrate, persist, and
> maintain pace. Moreover, the undersigned finds [Plaintiff's] documented
> difficulties with ADHD and controlling his anger at times, is more
> consistent with moderate limitations in the areas of understanding,
> remembering, or applying information and interacting with others.

11

(*Id.*) The ALJ also explained that he gave little weight to Dr. Roach's opinion regarding the need for assistance, coaching, and/or accommodations "because psychologist expert Dr. Lace testified an individual with the limitations he articulated at the hearing would not need these additional considerations." (*Id.*)

### D. State Agency Psychological Consultants

State agency psychological consultant Todd Finnerty, Psy.D. completed a Disability Determination Explanation Form in February 2014. (AR, Doc. No. 7-3 at PageID 124-29.) Dr. Finnerty found moderate impairment in the "B Criteria" areas of maintaining social functioning and maintaining concentration, persistence, or pace. (*Id.* at PageID 124.) He found mild restriction in Plaintiff's activities of daily living, and no repeated episodes of decompensation. (*Id.*)

In the mental RFC area of understanding and memory, Dr. Finnerty found moderate limitation in Plaintiff's ability to understand and remember detailed instructions. (*Id.* at PageID 127-28.) He opined:

> [Plaintiff] would be capable of understanding and following instructions to complete a basic work task. No specific testing is available, though he does report learning disabilities in school, therefore reading and writing are likely to be impaired. His ability to remember instructions would be impaired based on ADHD and he would likely need instructions repeated.

(*Id.* at PageID 128.) With respect to sustained concentration and persistence, Dr. Finnerty found moderate limitation in Plaintiff's ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to

perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Finnerty opined that Plaintiff could "sustain simple tasks without [a] fast pace." (*Id.*)

In the area of social interaction, Dr. Finnerty found moderate limitation in Plaintiff's ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. (*Id.* at PageID 128-29.) Dr. Finnerty explained:

> [Plaintiff] reports getting along with others is [sic] the workplace in the past and was generally appropriate with the examiner today. [H]e appears to be capable or [sic] interacting appropriately with coworkers and supervisors. He does report irritability and mood swings, therefore he may demonstrate verbal outbursts with others at work when provoked. He also reports experiencing anxiety "when a lot of people are looking at me," therefore he may not like working in large groups of people.

(*Id.* at PageID 129.) He opined that "[Plaintiff] can interact with others superficially." (*Id.*) In the final area of adaptation, Dr. Finnerty found moderate limitation in Plaintiff's ability to respond appropriately to changes in the work setting. (*Id.*) He opined that Plaintiff could "adapt to a static setting without frequent changes." (*Id.*)

Courtney Zeune, Psy.D. reviewed the updated record at the reconsideration level in May 2014. (AR, Doc. No. 7-3 at PageID 138-40, 142-44.) She affirmed Dr. Finnerty's findings for the "B Criteria" areas of functioning. (*Id.* at PageID 139.) In the mental RFC area of understanding and memory, Dr. Zeune affirmed Dr. Finnerty's finding of moderate impairment in Plaintiff's ability to understand and remember detailed

instructions. (*Id.* at PageID 142.) Dr. Zeune also affirmed Dr. Finnerty's opinion that

Plaintiff would likely need instructions repeated, although she opined that Plaintiff's

ability to remember "multi-step and detailed instructions" (as compared to "instructions,"

as opined by Dr. Finnerty) would be impaired. (*Compare* AR, Doc. No. 7-3 at PageID

128 *with* AR, Doc. No. 7-3 at PageID 142.)

Dr. Zeune also affirmed the areas of moderate impairment that Dr. Finnerty

identified regarding Plaintiff's ability to sustain concentration and persistence, and

additionally opined: "[Plaintiff] is capable of completing simple [one- to three-] step

tasks in a setting without strict production quotas or requiring prolonged periods of

uninterrupted concentration. He would benefit from a flexible break schedule due to

symptom flutuations [sic]." (AR, Doc. No. 7-3 at PageID 142-43.)

Dr. Zeune also affirmed Dr. Finnerty's finding of moderate impairment in several

areas related to social interaction, but opined that Plaintiff was limited to "infrequent[,]

superficial social interactions" and would "do best in a non-public setting with limited

interactions with co-workers and supervisors." (AR, Doc. No. 7-3 at PageID 143.) With

respect to adaptation, Dr. Zeune affirmed Dr. Finnerty's finding of moderate impairment

in Plaintiff's ability to respond appropriately to workplace changes, but opined that

Plaintiff could "adapt to a static setting without frequent changes where changes can be

explained in advance with gradual implementation." (*Id.* at PageID 143-44.)

The ALJ gave "some weight" to Dr. Zeune's opinions and "less weight" to Dr.

Finnerty's opinions. (2024 Decision, Doc. No. 7-21 at PageID 1022.) The ALJ

acknowledged that both consultants "are highly qualified physicians who are experts in

14

the evaluation of the medical issues in disability claims under the Act" and are "well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to mental limitations." (*Id.*) The ALJ explained that he gave "great weight" to Dr. Zeune's limitations for "simple tasks with no strict production quotas, superficial interactions with infrequent contact with supervisors and coworkers, and a static setting without frequent changes," because "the totality of the record supports these restrictions." (*Id.*) The ALJ further explained:

> While the undersigned has incorporated these limitations in the mental residual functional capacity above, they have not been adopted verbatim, noting some of the limitations are not in vocationally relevant terms. Thus, based on the evidence, which shows no more than moderate mental limitations, the undersigned has reframed [Plaintiff's] functional capacity above in order to use vocationally relevant terminology Dr. Zeune did not use in their opinions, noting that such limitations are consistent with the overall record, including the testimony of psychological expert Dr. Lace.

(*Id.*)

However, the ALJ gave "no weight" to Dr. Zeune's opinions that Plaintiff needs instructions repeated, needs changes gradually implemented, may benefit from a flexible break schedule, and needs a nonpublic work setting. (Decision, Doc. No. 7-21 at PageID 1022.) The ALJ reasoned:

> In arriving at this conclusion, the undersigned notes that psychological expert Dr. Lace opined that the limitations he opined at the hearing made these specific [sic] limitations unnecessary. Dr. Lace also opined that Dr. Zeune's finding [Plaintiff] may benefit from a flexible break schedule suggests a flexible break schedule is not necessary. The undersigned also finds her opinion regarding [Plaintiff's] need for a nonpublic setting entitled to no weight, as [Plaintiff's] ability to go shopping in stores, attend medical appointments, and appear at his hearings demonstrate an ability to tolerate occasional interaction with the public.

(*Id.*) Finally, the ALJ explained that he gave less weight to Dr. Finnerty's opinions because "the subsequent assessment of Dr. Zeune provides more specific limitations regarding concentration, social interactions, and ability to adapt to changes." (*Id.*)

### E.    Testifying Psychologist Michael Lace, Psy.D.

Michael Lace, Psy.D. reviewed Plaintiff's medical records and testified as an impartial medical expert during the December 2021 and August 2024 hearings. (AR, Doc. No. 7-15 at PageID 830-36; AR, Doc. No. 7-21 at PageID 1047-53.)

When asked at the December 2021 hearing to identify Plaintiff's medically determinable impairments, Dr. Lace stated that the medical records documented a mood disorder, a disruptive mood dysregulation disorder, ADHD, an impulse control disorder, a learning disorder, and a history of cannabis dependence. (AR, Doc. No. 7-15 at PageID 831-32.) Dr. Lace also stated that although the medical records "very occasionally" cited an "older diagnosis" of a schizophrenia spectrum disorder, unspecified, there was "not a lot in the record to support" such a diagnosis. (*Id*. at PageID 831.)

Dr. Lace summarized the medical records that documented Plaintiff's treatment for his mental impairments. (AR, Doc. No. 7-15 at PageID 832-34.) Next, Dr. Lace opined that Plaintiff experienced moderate impairment in all four "B criteria" areas of functioning. (*Id.* at PageID 834.) He opined that Plaintiff had the following limitations: simple, routine, and repetitive tasks; no fast-paced production-line-type work, occasional contact with coworkers, supervisors, and the general public; and no contact with or access to illegal drugs in any form (including law enforcement settings). (*Id.*) When Plaintiff's representative asked whether Plaintiff would have any other limitations

16

regarding social interactions, Dr. Lace stated: "Well perhaps being limited to brief and superficial contact, in other words not having a supervisor looking over his shoulder constantly but perhaps on a less frequent basis, so brief and superficial would be appropriate." (*Id.* at PageID 835.) When asked to define "superficial," Dr. Lace stated: "Well it wouldn't again mostly in terms of frequency that there, that there wouldn't be ongoing intensive check-ins over time. So, I think within the tasks [that] are simple and routine. I think traditional amounts of contact would probably be appropriate." (*Id.*) Finally, when asked whether Plaintiff would need extra breaks or breaks outside of a normal break schedule, Dr. Lace opined:

> I'm not sure there's a lot of evidence in the record to support that. I think within the confines of the limitations offered, the simple, routine, repetitive tasks and brief superficial and occasional contact and no fast-paced production line type work I think shouldn't, shouldn't need that.

(*Id.* at PageID 836.)

During the August 2024 hearing, the ALJ again asked Dr. Lace to identify Plaintiff's medically determinable impairments. (AR, Doc. No. 7-21 at PageID 1048.) This time, Dr. Lace stated that the medical records documented a bipolar disorder, a mood disorder, ADHD, and a disruptive behavior disorder. (*Id.* at PageID 1049-50.) Dr. Lace stated that the medical records contained "some references" to schizophrenia: "Not a lot of support in terms of references to the severity or frequency of the psychotic symptoms, but it is diagnosed." (*Id.* at PageID 1049.) With respect to a learning disorder, Dr. Lace testified: "There are references to a 12.02 condition described as learning disorders in math and spelling and then we [do not] see a lot of reference to that

17

elsewhere, but it is there." (*Id.*) Finally, Dr. Lace stated that the records showed "a history of a cannabis use disorder described as severe . . . which renders the mental health-related diagnoses a little bit dubious and less reliable than they could be due to the symptom overlap of – that's found with cannabis use and the conditions that I highlighted." (*Id.* at PageID 1050.)

Dr. Lace summarized the medical records that documented Plaintiff's treatment for his mental impairments, including records submitted since the December 2021 hearing. (AR, Doc. No. 7-21 at PageID 1050-51.) Dr. Lace again opined that Plaintiff experienced moderate impairment in all four "B criteria" areas of functioning.[7] (*Id.* at PageID 1051.) With respect to work-related limitations, Dr. Lace opined:

> I think [Plaintiff] would be limited to simple, routine, repetitive tasks; would be limited to work with no fast-paced production requirements; would be limited to work with no more than occasional interaction with coworkers, the general public, and supervisors; and would be limited to work with no or little possibility of contact with cannabis specifically.

(*Id.*)

Plaintiff's representative then asked Dr. Lace a series of questions regarding whether he agreed with certain limitations identified by the consultative and state agency reviewing psychologists. (AR, Doc. No. 7-21 at PageID 1052-53.) Dr. Lace responded as follows:

---

[7] Regarding the areas of understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself, Dr. Lace stated: "mild to moderate [impairment], going with moderate [impairment]." (AR, Doc. No. 7-21 at PageID 1051.)

| Opined Limitation | Dr. Lace's Response |
|---|---|
| "[W]ould need instructions repeated due to his impaired ability to remember instructions." | "Well, that would be the case without the limitation of simple, routine, and repetitive tasks. I don't think that would be necessary if that – if the RFC were adhered to the limitations that I suggested based on the record." |
| "[W]ould need increased supervision to ensure follow through and [an] environment with minimal distractions, redirections with tasks, and opportunities for breaks." | "I don't think if the limitations based on the RFC were adhered to. I wouldn't see that as being necessary." |
| "[W]ould be expected at times to have verbal outbursts with others in a work setting." | "Again, if there's limited social contact, so that's limited to occasional, I wouldn't see that as a problem. It – it's not an ongoing issue in the record. I mean it does occur once in a while, but it's not an ongoing severe concern. I didn't see a lot of evidence of ongoing contact with the law, resulting in charges or anything like that." |
| "[O]ccasional [interactions with others] as far as frequency . . . quality-wise he would be limited to no more than superficial interaction with others." | "Yeah, I think that would be best too with the old SSA terms of brief and superficial. I think that would be appropriate." |

(*Id.* at PageID 1052.)

The ALJ afforded great weight to Dr. Lace's opinions. (2024 Decision, Doc. No.

7-21 at PageID 1021.) The ALJ explained that Dr. Lace is a licensed psychologist who is

"well qualified by reason of training and experience in reviewing an objective record and

formulating an opinion as to medical severity."[8] (*Id.*) Further, Dr Lace "has knowledge of

---

[8] The undersigned notes, however, that the issue of whether Plaintiff can perform work with certain mental limitations—including the limitations opined to by the examining and reviewing psychologists—is arguably more appropriate for the testimony of a vocational expert, not a medical expert such as Dr. Lace.

the Social Security Administration program and had access to all the medical evidence on record when he offered his opinion." (*Id.*) The ALJ found that Dr. Lace's "analysis is consistent with and supported by objective clinical findings found in the record at the administrative hearing level … as well as [Plaintiff's] testimony at the hearing," and "is also based on a greater longitudinal perspective of [Plaintiff's] condition." (*Id.*) The ALJ therefore concluded that Dr. Lace's assessment "is more probative and reliable than the analysis from the state agency reviewing sources." (*Id.*) The ALJ also explained that "[w]hile Dr. Lace's opinions have been incorporated in the residual functional capacity above, the undersigned has reframed his testimony regarding [Plaintiff's] mental functional capacity in vocationally relevant terminology." (*Id.*)

## F.     Vocational Expert Testimony

Plaintiff argues that the evidence supports stricter RFC limitations (to have instructions repeated, increased supervision, and a flexible break schedule, as well as to allow for verbal outbursts) that are work preclusive. (SE, Doc. No. 8 at PageID 1648-50.) The Vocational Expert testified during the August 2024 hearing that a hypothetical individual of Plaintiff's age, education, work experience, and RFC—but with an

---

*Compare Griffin v. Astrue*, 3:07CV0447, 2009 U.S. Dist. LEXIS 131319, at *26-27 (S.D. Ohio Feb. 13, 2009) (Ovington, M.J.), *report and recommendation adopted*, No. 3:07cv00447, 2009 U.S. Dist. LEXIS 17175 (S.D. Ohio Mar. 6, 2009) (Rose, D.J.) (citing *Richardson v. Perales*, 402 U.S. 389, 408 (1977)) ("The primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases."), *with Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 562 (6th Cir. 2022) (citing *Biestek v. Berryhill*, ──── U.S. ────, 139 S. Ct. 1148, 1152, (2019)) (vocational experts provide "'current knowledge' about the nature and availability of various jobs based on publicly available data as well as the experts' own experience in job placement or career counseling," and testimony about whether "a person with the claimant's work experience and [functional] limitations could perform a significant number of jobs available in the national economy").

additional limitation that the individual would be off task for fifteen percent of the time during the workday—would be unable to perform competitive work. (AR, Doc. No. 7-2 at PageID 1070.) The Vocational Expert likewise testified that a worker who requires direct supervision for up to one-third of the workday would be unable to perform any competitive employment. (*Id.*) When asked whether a need to have instructions repeated would impact the ability to sustain unskilled work activity, the Vocational Expert stated:

> Once these types of positions are learned, [it is] not expected that the supervisor or another coworker would have to give any additional instructions. I think more than once or twice after that once [they are] learned, and then after that there would be no tolerance for that so they would be dismissed for that employment.

(*Id.* at PageID 1071.) Further, when asked whether an employer would tolerate "verbal outbursts with others" in an unskilled work setting, the Vocational Expert responded: "Depending on the degree of it, it – the first time they may get a verbal or a written warning. If [it is] something that would be extreme or would continue, they would be dismissed from that employment." (*Id.* at PageID 1072.)

## IV.    LAW AND ANALYSIS

For his sole assignment of error, Plaintiff states that "[t]he ALJ's mental RFC is not supported by the substantial evidence of record." (SE, Doc. No. 8 at PageID 1644.) He contends that the ALJ "erroneously rejected or devalued almost every mental health opinion in order to rely almost exclusively on the testimony of the non-examining medical expert who testified at the hearing." (*Id.*) Plaintiff challenges the ALJ's analysis of the opinions of consultative psychologist Dr. Sisson, examining psychologist Dr. Roach, and the state agency psychological consultants. (*Id.* at PageID 1644-49.) Plaintiff

also challenges the ALJ's decision to adopt Dr. Lace's opinion that "if [Plaintiff] was limited to simple, routine, and repetitive tasks there would be no need for [the] additional limitations [like a need for redirection, or increased supervision, or repeated instructions]." (*Id.* at PageID 1649.) Finally, Plaintiff contends that the ALJ erred by crediting Dr. Lace's opinions "simply because his testimony was the most recent." (*Id.* at PageID 1650.) According to Plaintiff:

> This case has a lengthy procedural history with an application date dating back to 2013. Tr 201. Every mental health opinion, with the exception of Dr. Lace, was fairly early in the record. They clearly documented significant mental health restrictions during that early time period of when Mr. Simpson filed his claim. If the ALJ wants to find that Mr. Simpson improved or that there was less evidence of disability at later points of the record, that is fine, that is something that can still be addressed on remand. However, it is difficult to look at this record, beginning with Mr. Simpson's application and claim that there was not at least a twelve[-] month period where he was disabled – as alleged by four different mental health providers.

(*Id.*) For the reasons set forth below, the undersigned Magistrate Judge finds this alleged error to be well-taken and therefore recommends that the ALJ's decision be reversed.

## A.    Applicable Law.

Determination of the RFC is a task reserved for the ALJ. 20 C.F.R. § 404.1546(c); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of his [RFC]'"). A claimant's RFC describes the most he can do in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). When formulating the RFC, the ALJ must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R.

22

§ 404.1545(a)(4). The ALJ must base the RFC on all relevant evidence in the record, including the claimant's descriptions of his limitations and symptoms, objective medical evidence, medical opinions, other medical evidence, evidence from non-medical sources, and prior administrative medical findings. *See* 20 C.F.R. § 404.1545(a)(1)-(5).

Because Plaintiff's claim was filed before March 27, 2017, the opinion evidence rules set forth in 20 C.F.R. § 416.927 governed the ALJ's analysis of medical opinions and prior administrative medical findings. Those rules require the ALJ to consider and evaluate every medical opinion in the record, although "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted). "Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2); other citation omitted)). Finally, when evaluating medical opinions from sources other than treating sources, the ALJ must consider the examining relationship, treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. § 416.927(c).

The ALJ is required to consider evidence from the entire relevant time period when formulating the RFC. *E.g., White v. Comm'r of Soc. Sec.*, No. 3:21-cv-762, 2022 U.S. Dist. LEXIS 140674, *47 (N.D. Ohio June 1, 2022) (Knapp, M.J.), *affirmed by* 2022 U.S. Dist. LEXIS 139178 (N.D. Ohio Aug. 4, 2022) (Knepp, D.J.). As Magistrate Judge Knapp explained, "[w]hile the substantial evidence standard is deferential, the Sixth

23

Circuit has emphasized that the chief limitation to that deference 'is the requirement that all determinations be made based upon the record in its entirety.'" 2022 U.S. Dist. LEXIS 140674, *47 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007)). Thus, an ALJ should not "unduly concentrate on one single aspect of the claimant's history." *Rogers*, 486 F.3d at 249.

Notably, "[t]he responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 404.1546(c)). An ALJ is required to consider medical opinion evidence when determining the RFC, but he is not required to adopt them or adopt any such findings verbatim. *Poe*, 342 F. App'x at 156-57 (6th Cir. 2009). In addition, "[t]he determination of a plaintiff's RFC is entirely within the purview of the ALJ, and this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Rieder v. Comm'r of Soc. Sec.*, No. 2:20-CV-05858, 2021 WL 5881784, at *5 (S.D. Ohio Dec. 13, 2021) (internal quotations and citation omitted) (Preston Deavers, M.J.).

Nevertheless, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of the SSA*, No. 3:21-CV-00129, 2022 U.S. Dist. LEXIS 175673, at *11 (S.D. Ohio Sept. 27, 2022) (Silvain, M.J.) (internal citation omitted). Thus, "[t]his Court cannot uphold an ALJ's decision, even if there if there is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (cleaned up) (internal quotations and citation omitted). *See also*

*Danyel P. v. Comm'r of Soc. Sec.*, No. 2:21-CV-02405, 2022 WL 1514170, at *6 (S.D. Ohio May 13, 2022) (Preston Deavers, M.J.) (ALJ's "inexplicable and illogical consistency" warranted remand); *Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00310, 2022 WL 17820565, at *3 (S.D. Ohio Dec. 20, 2022) (Silvain, M.J.) (ALJs must "provide a coherent explanation of [their] reasoning . . . in order to provide sufficient rationale for a reviewing adjudicator or court"); *Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 WL 3762266, at *5 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the ground that "the ALJ's decision is internally inconsistent and incomplete").

> **B.    The ALJ Reversibly Erred When Analyzing the Opinions of Consultative Psychologist Dr. Sisson, Examining Psychologist Dr. Roach, And the State Agency Psychological Consultants.**

Plaintiff asserts that the ALJ erroneously relied on testifying medical expert Dr. Lace's opinion to reject portions of the opinions of Drs. Sisson, Roach, Finnerty, and Zeune. (SE, Doc. No. 8 at PageID 1644-49.) The undersigned agrees that the ALJ erred by failing to build a logical bridge that explains how the RFC limitations opined to by Dr. Lace either include or render unnecessary the RFC limitations identified by Drs. Sisson, Roach, Finnerty, and Zeune. In addition, the undersigned finds that the ALJ erred by failing to base the RFC upon evidence from the entire time period at issue. Finally, the undersigned finds that the ALJ erred by failing to consider a closed period of benefits.

1. **The ALJ did not build a logical bridge between the RFC, Dr. Lace's opinions, and the ALJ's decision to discount portions of the opinions of Drs. Sisson, Roach, Finnerty, and Zeune.**

The undersigned concludes that the ALJ erred by failing to build a logical bridge between the RFC limitations, which were based upon Dr. Lace's opinions, and the ALJ's decision to discount portions of the opinions of Drs. Sisson, Roach, Finnerty, and Zeune, who all recommended additional mental limitations that were not included in the RFC.

The ALJ explained that he gave little or no weight to the opinions of these examining and reviewing psychologists because the mental limitations that Dr. Lace identified during the hearing accounted for the impact of their opinions. (2024 Decision, Doc. No. 7-21 at PageID 1022-23.) Critically, however, the ALJ did not analyze whether, how, or why the limitations that Dr. Lace identified and the ALJ included in the RFC either included or rendered unnecessary the limitations identified by Drs. Sisson, Roach, Finnerty, and Zeune (i.e., repetition of instructions, gradual implementation of changes, increased supervision, minimal distractions, and a flexible break schedule). (*Id.* at PageID 1021.) Nor did Dr. Lace explain his statement that the limitations recommended by these psychologists would be unnecessary if the RFC included his recommended limitations. (AR, Doc. No. 7-15 at PageID 830-36; AR, Doc. No. 7-21 at PageID 1047-53.) Instead, the ALJ appeared to accept Dr. Lace's blanket assertion at face value. Furthermore, the ALJ appeared to rely entirely upon Dr. Lace's assertion, as the ALJ did not discuss the objective medical evidence when he discounted the other psychologists' opinions and recommended limitations.

26

The undersigned acknowledges that an ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023); *see also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004). Nevertheless, the ALJ must "provide sufficient explanation for the claimant and any reviewing court to 'trace the path of his reasoning'" and explain "with specificity" how the evidence supports the RFC limitations. *Correa*, 2023 U.S. Dist. LEXIS 231766, at *31-32 (citing *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011); *Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 U.S. App. LEXIS 1621, at *12 (6th Cir. Feb. 2, 1999); *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 U.S. Dist. LEXIS 11925, at *12 (S.D. Ohio Feb. 8, 2011).

Here, the ALJ failed to explain how Dr. Lace's recommended limitations either included or rendered unnecessary the other psychologists' suggested limitations. This error makes this Court unable to "trace the path of his reasoning." *Correa*, 2023 U.S. Dist. LEXIS 231766, at *31-32. The ALJ also did not explain "with specificity" whether objective medical evidence in the record supported the limitations recommended by the other psychologists but omitted from the RFC. *Id*. The absence of the required logical bridge constitutes a reversible error.

Defendant contends that the ALJ properly explained that he gave great weight to Dr. Lace's opinion because of Dr. Lace's expertise and knowledge of SSA programs, his review of the longitudinal record, and the supportability of his opinion with the record.

(Mem. In Opp., Doc. No. 9 at PageID 1657-59.) But these reasons only explain the ALJ's decision to adopt Dr. Lace's recommended limitations. (2024 Decision, Doc. No., 7-21 at PageID 1021.) The ALJ did not provide any reasons, or cite any evidence, to support his conclusion that the additional limitations suggested by the examining and reviewing psychologists were accounted for by Dr. Lace's recommended limitations. (*Id.* at PageID 1021-23.) The ALJ's rejection of portions of the examining and reviewing psychologists' opinions, without providing an adequate explanation of his reasons for rejecting them, constitutes an error of law that warrants reversal.

> **2.    The ALJ did not base the RFC upon the evidence from the entire time period at issue.**

The ALJ also erred by failing to account for evidence from the entire relevant time period and instead relying heavily on recent medical evidence when formulating the RFC, while giving little weight to the earlier opinions of the examining and reviewing psychologists. The ALJ's discussion of the medical evidence ignored significant evidence documented during the fifteen-month period after the SSI application date. By ignoring or minimizing this earlier evidence and relying heavily on later evidence, the ALJ failed to base the RFC "upon the record in its entirety." *Rogers*, 486 F.3d at 249.

In the summary of the medical evidence, the ALJ focused heavily upon later records that showed an improvement in Plaintiff's mental conditions as well as upon earlier records that documented Plaintiff's intermittent failures to take medications:

> While the evidentiary record documents extensive gaps in treatment and
> medication non-compliance since July 15, 2005, including on March 5,
> 2013, when he reported he had been slacking on taking his medications, on
> August 6, 2013, when he noted he had not been taking his medications

regularly and eventually stopped taking them entirely (Ex. 1F/3-4), and on July 1, 2014 when he claimed he had learned to control his anxiety with music and headphones after he had stopped taking his Lithium and Risperdal (Ex. 6F/3), subsequent treatment notes show he eventually reengaged in treatment and remained relatively compliant with his psychotropic medications.

Notwithstanding [Plaintiff's] noncompliance with treatment, the record shows he has been prescribed and taken appropriate medications for his mental impairments since July 15, 2005, including Lexapro and Seroquel (see e.g., Exs. 1F/5; 22F/4, 17; 24F/5; 37F/3; 38F/3). However, the medical evidence reveals that these medications have been relatively effective in controlling [Plaintiff's] symptoms when he was compliant and taking them as prescribed, as he has denied psychological problems many times and treatment providers have failed to appreciate any psychological abnormalities on several occasions (see generally Exs. 9F/40-41, 57; 11F/7-8; 22F; 24F; 30F/67; 38F/7).

(2024 Decision, Doc. No. 7-21 at PageID 1014.) Most of the examinations cited by the ALJ describe Plaintiff's condition after December 2018, which was more than five years after the SSI application date. (*See* AR, Doc. No. 7-26 at PageID 1415-31, 1437-45, 1528-39, 1573-74.) And the ALJ failed to acknowledge that Plaintiff told his providers several times that he did not want to take psychotropic medications because of adverse side effects. (*See, e.g.,* AR, Doc. No. 7-7 at PageID 310-12, 362, 375, 392.)

When the earlier records are considered, a different picture emerges. During an August 2013 behavioral health visit, Plaintiff exhibited slowed and deliberate speech and stated that he stopped taking his medications because of the side effects, which included a "dreamy feeling," hearing voices, and a "shadow in [the] corner of [his] eye." (AR, Doc. No. 7-7 at PageID 311.) In September 2013, Plaintiff complained that the medication he was taking "prevent[ed] him from sleeping." (*Id.* at PageID 310.) Plaintiff said he had not

heard voices lately but was experiencing mood swings that were worse in the mornings. (*Id*.) He also needed to take naps "often." (*Id*.) The ALJ did not cite this evidence.

Although the ALJ cited Dr. Sisson's normal mental status findings during a December 2013 examination (*see* 2024 Decision, Doc. No. 7-21 at PageID 1015), he did not cite Dr. Sisson's abnormal findings during a February 2014 examination. Plaintiff reported a "very hyper" energy level and Dr. Sisson noted his "behavioral presentation [was] notable for distractibility and tangential thinking." (AR, Doc. No. 7-7 at PageID 365-67.) Dr. Sisson noted Plaintiff contradicted himself "at times" and "[e]mbellishment and spontaneity are excessive and require redirection." (*Id.* at PageID 366.) Further, although Plaintiff accurately completed some cognitive tests, Dr. Sisson concluded that his overall performance showed "deficits in immediate attention, sustained concentration, and mental arithmetic." (*Id.* at PageID 368-69.) The ALJ did not consider this evidence.

In his summary of consultative psychologist Dr. Roach's July 2014 assessment, the ALJ noted that Plaintiff's memory, recall and attention span were in the borderline range, and his overall intellectual functioning was in the low average range. (2024 Decision, Doc. No. 7-21 at PageID 1015.) The ALJ cited several normal mental status findings and Plaintiff's denial of anxiety but acknowledged Plaintiff's reports of "severe mood swings and lack of impulse control." (*Id*.) However, the ALJ did not acknowledge that Plaintiff's performance on achievement testing showed "learning discrepancies [that] have qualified him for learning accommodations." (AR, Doc. No. 7-7 at PageID 378.) Nor did the ALJ acknowledge Dr. Roach's findings that Plaintiff "seems unable to follow

30

through on tasks" and that his judgment to make important decisions about his future was "marginal at times and flawed at other times." (*Id.* at PageID 376-77.)

The ALJ cited Plaintiff's statements during a July 2014 behavioral health visit that he "did not like taking psychotropic medications," "was smoking marijuana because it helped him deal with his anger," and "was not interested in stopping his marijuana use." (2024 Decision, Doc. No. 7-21 at PageID 1016.) The ALJ acknowledged that Plaintiff "reported serious depression, anxiety, and tension, hallucinations, trouble understanding, concentrating, or remembering, trouble controlling violent behavior, and serious thought of suicide." (AR, Doc. No. 7-7 at PageID 491.) But the ALJ ignored the provider's observation that Plaintiff exhibited aggressive behavior and flight of ideas, as well as grandiose delusions. (*Id.*) The ALJ also did not acknowledge the provider's observation that Plaintiff exhibited impaired attention and concentration during the assessment. (*Id.*) Instead, the ALJ stated that Plaintiff "presented as cooperative with a euthymic mood and full affect." (2024 Decision, Doc. No. 7-21 at PageID 1016.)

The ALJ did not cite medical evidence dated during the time period between this July 2014 visit and the end of December 2014. However, progress notes from this time period document significant symptomatology that further supports the examining and reviewing psychologists' opinions.

For example, later in July 2014, Plaintiff told a counselor that he was unable to work due to "anger issues." (AR, Doc. No. 7-7 at PageID 422.) He said he was recently involved with the courts for "trespassing, resisting arrest, and reckless operation." (*Id.* at PageID 419.) The counselor noted that Plaintiff was "[v]ery flippant about these

charges," and reportedly told the police chief that "if you want to see reckless ops, I will show you reckless ops." (*Id.*) Plaintiff said he hoped to "figure out ways to calm and give me more information about my anger and how to control it before situations even start." (*Id.*) The counselor's mental examination findings included decreased variability of expression, restlessness, limited insight ("blames others or circumstances"), difficulties making life decisions, impaired recent memory, reports of suicidal and homicidal ideation, a depressed mood, aggression and anger with little provocation, and anti-social traits. (*Id.* at PageID 422-26.) Plaintiff also complained of mood swings and difficulty sleeping. (*Id.* at PageID 425.) Plaintiff said he was not currently taking any psychotropic medications because they caused hallucinations. (*Id.* at PageID 423.)

During a counseling session in September 2014, Plaintiff was cooperative and calm but "appeared uneasy" and initially had poor eye contact. (AR, Doc. No. 7-7 at PageID 428.) Plaintiff requested a psychiatric consultation to discuss "medications to help him control his 'outbursts.'" (*Id.*) The provider documented "some delusional thinking." (*Id.*)

Plaintiff saw psychiatrist Dr. Balogh later in September 2014. (AR, Doc. No. 7-7 at PageID 438-43.) Dr. Balogh's mental status examination showed suicidal and homicidal ideation, preoccupation with violence, obsessions "about issues that upset him," limited insight into his problems, impaired attention span, distractibility, a blunted and flattened affect, and a labile mood. (*Id.* at PageID 441-42.) Dr. Balogh prescribed Alprazolam and Olanzapine. (*Id.* at PageID 443.)

At a subsequent counseling session, Plaintiff said the new medications were "really working" and that he was sleeping better and felt calmer. (AR, Doc. No. 7-7 at PageID 429.) However, Plaintiff's counselor reported in November 2014 that Plaintiff appeared "distracted and with poor focus." (*Id.* at PageID 434.) She had to "redirect[] [Plaintiff] several times away from threatening and inappropriate talk." (*Id.*)

During a follow-up visit with Dr. Balogh in November 2014, Plaintiff said he was doing "a lot better" with the medications and was less irritable. (AR, Doc. No. 7-7 at PageID 446.) However, although Plaintiff exhibited an appropriate mood and affect, he again showed impaired attention and distractibility. (*Id.* at PageID 450.) Later that month, Plaintiff's counselor noted that he appeared disheveled and indicated that he had not made any progress. (AR, Doc. No. 7-7 at PageID 435-36.) Plaintiff's counselor again indicated "no progress" in December 2014. (*Id.* at PageID 437.)

In sum, the ALJ ignored or minimized the objective medical evidence regarding Plaintiff's mental conditions that was dated during the time period between the SSI application date and December 2014. Because the ALJ did not account for evidence from the entire relevant time period, reversal is warranted.

### C. The ALJ's Errors Are Not Harmless.

Generally, an ALJ's procedural error will be deemed harmless—and therefore will not be reversible—unless the claimant shows that the error prejudiced him on the merits or deprived him of substantial rights. *Rabbers v. Comm'r of the Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (quoting *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).

For the reasons set forth above, the undersigned finds that the ALJ erred by (1) failing to build a logical bridge between the RFC, Dr. Lace's opinions, and the decision to discount portions of the opinions of Drs. Sisson, Roach, Finnerty and Zeune; and (2) failing to base the RFC upon evidence from the entire relevant time period. These errors are not harmless. The ALJ's failure to build a logical bridge that explains his decision to discount portions of the examining and reviewing psychologists' opinions prevented this Court from engaging in meaningful judicial review. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 440 (6th Cir. 2018) ("[A]n ALJ's failure to follow agency procedures does not constitute harmless error when it prevents us from meaningfully reviewing his or her decision"). And the ALJ's failure to consider evidence from the entire relevant time period when formulating the RFC prejudiced Plaintiff on the merits. Accordingly, reversal is warranted.

## V.     PARTIAL AWARD OF BENEFITS AND PARTIAL REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). In the Sixth Circuit, an immediate award of benefits is only proper "if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d

34

171, 176 (6th Cir. 1994). To meet this standard, the Court must find that proof of disability is either overwhelming or is strong while contrary evidence is lacking. *Id*.

Here, Plaintiff asserts: "[I]t is difficult to look at this record, beginning with [Plaintiff's] application and claim that there was not at least a twelve[-] month period where he was disabled – as alleged by four different mental health providers." (SE, Doc. No. 8 at PageID 1650.) The undersigned agrees and finds that <u>for a closed period of disability from the SSI application date of September 26, 2013, to December 31, 2014,</u> the evidence of disability is overwhelming. Specifically, the opinions of two independent examining psychologists (AR, Doc. No. 7-7 at PageID 360-71; 374-87) and the state agency psychological consultants (AR, Doc. No. 7-3 at PageID 124-29, 138-40, 142-44), along with the Vocational Expert's testimony during the August 2024 hearing,[9] overwhelmingly support a finding of disability during the closed period. The undersigned therefore recommends that this case be remanded for an immediate award of benefits for a closed period of disability from September 26, 2013 to December 31, 2014.

For the time period since January 1, 2015, however, an immediate award of benefits is unwarranted because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. The undersigned therefore also recommends that the Court remand this case to the Social Security

---

[9] The Vocational Expert testified than an individual who would be off task for fifteen percent of the time during the workday, require direct supervision for up to one-third of the workday, need instructions repeated more than twice after unskilled work is learned, or exhibit continued verbal outbursts with others would be unable to sustain full-time competitive employment. (AR, Doc. No. 7-2 at PageID 1070-72.) These hypotheticals account for the cumulative opinions of the independent examining psychologists and the state agency psychological consultants.

Administration pursuant to Sentence Four of Section 405(g) for further proceedings regarding the period since January 1, 2015. On remand, the ALJ should further develop the record as necessary, particularly as to the medical opinion evidence, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for SSI should be granted for the time period since January 1, 2015.

**IT IS THEREFORE RECOMMENDED THAT**:

1.  Plaintiff's Statement of Errors (Doc. No. 8) be GRANTED;

2.  The Court REVERSE the Commissioner's non-disability determination;

3.  This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for an immediate award of benefits for the closed period from September 26, 2013 to December 31, 2014, and for further proceedings for the period since January 1, 2015; and

4.  This case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).